UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC. and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court, District of Columbia.

Dec. 28, 1983.

James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Richard Levine, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Howard J. Trienens, Jim G. Kilpatric, John D. Zeglis, Francine Berry, New York City, for defendants.

MEMORANDUM

HAROLD H. GREENE, District Judge.

On December 22, 1983, AT & T moved for an order requiring Bell Atlantic, one of the Regional Operating Companies, to cease and desist from performance of a contract it had entered into with the General Services Administration (GSA), a federal government agency.

It appears that Bell Atlantic bid on, and on December 12, 1983, was awarded, a contract from GSA for the sale to the

government of the bulk of the embedded customer premises equipment (CPE) located on government's property in the Bell Atlantic area, including some 200,000 telephone sets currently leased to the government. The contract also included provisions for "follow on" services by Bell Atlantic with respect to this CPE, such as maintenance, rearrangements, and additions, and a one-year warranty. Bell Atlantic intends to retain in its employ and to use in connection with the GSA contract several hundred Bell System employees who otherwise would have been assigned to AT & T as of the time of divestiture. According to AT & T's motion, all of these past and proposed actions of Bell Atlantic violate the decree, the plan of reorganization, and AT & T policy.

Bell Atlantic has responded, asserting that its contract with GSA and its plans with respect thereto are in violation neither of the decree nor of the plan of reorganization; that factual disputes exist regarding AT & T's policies and their impact on Bell Atlantic; and that there is no basis for judicial inference with its contract with GSA.

In view of the urgency of AT & T's request, and Bell Atlantic's concurrence that an early decision by the Court was required, the Court convened an immediate hearing at which counsel for the two protagonists as well as counsel for the government presented legal argument.[1]

## I.

The decree in this case provides for the division of the Bell System's assets, liabilities, functions, and personnel between AT & T and the various Operating Companies as of the time of divestiture. Specifically, section I(A)(2), (4) requires that the "facili-

ties, personnel and books of account ... relating to ... the provision of customer premises equipment" shall at that time be retained by AT & T (as distinguished from their assignment to the Operating Companies). See *United States v. AT & T,* 552 F.Supp. 131, 192 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* —— U.S. ——, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). It is clear from these provisions that, as of January 1, 1984—less than three weeks from the date of Bell Atlantic's contract with GSA and less than one week from today—Bell Atlantic would have no power to make any disposition regarding the CPE and CPE-related services and personnel at issue here: all of them will from that date on be exclusively AT & T's. The question here is whether there is any reason why Bell Atlantic could not sell or otherwise dispose of these assets, and to enter into contracts regarding these services and that personnel, in advance of that date.

Except for unrelated matters, the only specific provision regarding CPE in the decree itself is that referred to above. There is no reference in the decree to the ownership, the power of disposition, or the assignment of CPE or CPE-related functions or personnel prior to divestiture—for good reason, as will be seen below. However, the plan of reorganization, approved by the Court on July 8, 1983, (*United States v. Western Electric Co.,* 569 F.Supp. 1057 (D.D.C.1983), *aff'd,* —— U.S. ——, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983)), does contain several clauses which have relevance to the present dispute. That plan assigns to AT & T, not the Operating Companies, the CPE assets and related accounts, the CPE installation and maintenance functions, and virtually all personnel performing such functions.[2]

---

1. The government was represented by the Justice Department's Antitrust Division, but counsel for the Civil Division, representing GSA, was also heard.

2. *Plan of Reorganization* at 78–88, 241–42, 249–50. Thus, the plan carefully separates the CPE, such as that involved here, being assigned to AT & T, from that being assigned to the Operating

Companies (pp. 78–88); it provides that "the vast majority of job functions associated only with CPE will ... be assigned to AT & T" (p. 241); and it specifies that "[a]ll BOC employees in the work groups performing installation and maintenance functions only on [business embedded] CPE will be assigned to AT & T" (p. 249).

In the Court's view, there can be no doubt that, at a minimum, these provisions forbid execution of that part of the Bell Atlantic-GSA contract which contemplates "follow on" services to be performed by CPE-related employees. In fact, the Department of Justice has conceded as much, and in a sense so has Bell Atlantic (although that company contends that in this respect the plan has, somehow, become obsolete).[3]

What about the sale of CPE itself, apart from maintenance contracts and personnel assignments? Initially, it is not at all clear that the contract with GSA can be neatly separated into its various component parts as the Department of Justice, for one, has advocated. If the provisions for maintenance of the CPE by Bell Atlantic personnel are inconsistent with the decree and therefore cannot be implemented—as the Department appears to concede—it may well be that the entire contract fails. Beyond that, however, there is no sound basis for Bell Atlantic's position that it is free to sell CPE prior to divestiture against the wishes of AT & T.

As indicated, the decree does not explicitly prohibit such sales. That is not particularly surprising. The decree fails to regulate Operating Company conduct at the pre-divestiture stage in all or almost all respects, for good reason. Prior to divestiture, these companies have no independent discretion vis-a-vis AT & T; to the contrary, they are subject to AT & T's ultimate control just as they have been for a hundred years. It would have been redundant for the decree to prohibit the Operating Companies from engaging in activities objected to by AT & T with respect to a period of time when they were and are under AT & T's legal and practical control and supervision. Thus, if no provision is made in the decree to guard against the sale or dissipation by the Operating Companies of the assets which under the decree are assigned to AT & T it obviously is because prior to divestiture AT & T could always prevent such activities by a stroke of the pen. The decree's silence on this issue therefore does not permit the drawing of the inference that the Operating Companies may do with CPE as they wish.

Bell Atlantic, with some support from the Department of Justice, argues that it has authority from AT & T to sell CPE, and it points in that regard to AT & T's failure to object to, indeed its support of, the sale by the Operating Companies of single-line telephones to the public. But such sets are being sold pursuant to explicit authority from AT & T in the form of a memorandum from its president and its vice-chairman of the board.[4] Moreover, whatever AT & T may or may not have objected to in the past,[5] it is clear that it does object to the present sale to GSA. Until January 1, 1984, Bell Atlantic and the other Operating Companies are not independent of AT & T,[6] and upon the registra-

---

3. Tr. 25, 760–62. The argument seems to be that the parties have in practice, by mutual consent, deviated in some respects from the plan of reorganization where it seemed practical and expedient to do so. If that is accurate, it comes as news to this Court, as it must also come as news to the intervenors in this lawsuit who have a stake in the integrity of the decree and the plan. In any event, there is obviously no agreement between AT & T and Bell Atlantic regarding the particular deviation from the plan presently before the Court.

4. That memorandum states in pertinent part that "the plan [for securing FCC approval for detariffing embedded CPE and its transfer to American Bell by divestiture] should include sale of single-line non-key telephone sets only and does not include such sets behind coin, key, PBX, or in conjunction with Centrex or ESSX–1 Service." Memorandum dated January 24, 1983, from W.M. Ellinghaus and J.E. Olson to the Operating Company presidents and others.

5. Bell Atlantic cannot use as a sword AT & T's restraint and its concomitant reticence during the pre-divestiture period with respect to the issuance of formal orders to the Operating Companies. Presumably AT & T has done that so as not to lay itself open to the charge that it improperly influenced those companies with regard to subjects on which their independent judgment was sought or required by this Court and others.

6. Bell Atlantic has not become independent merely because its shares are traded on the New York Stock Exchange on a "when issued" basis

tion of such an objection—absent contrary decree provisions (see *infra*)—the Court hears AT & T's voice rather than that of Operating Companies.[7]

To be sure, the Court has encouraged the Operating Companies to give it their candid views (and they have done so) and to assert their independence from AT & T in negotiations regarding the plan of reorganization and the implementation of the divestiture generally (and they have done that). But it does not follow that when, prior to divestiture, there is a dispute between AT & T and an Operating Company with respect to a matter on which the decree and the plan of reorganization either supports the former or is, at best, silent, the Court would be justified in adopting the Operating Company position over that of AT & T. Bell Atlantic is simply wrong in its assumption that it is AT & T's obligation to find provisions in the decree which are inconsistent with the Bell Atlantic position.[8] In view of Bell Atlantic's subordinate role prior to January 1, 1984, it is its burden to point to decree or plan provisions affirmatively sustaining its position if it wishes to prevail over the objections of its parent.

In sum, considering solely the narrow legal issues arising under the decree, the plan of reorganization, and the AT & T corporate structure,[9] the Bell Atlantic contract cannot withstand AT & T's objections.

## II.

As the parties have recognized, the stimulus for Bell Atlantic's entry into the current contractual relationship is its desire to get its "foot in the door" with respect to the sale and maintenance of CPE to the government, a large and important customer. Having sold 200,000 telephone sets to GSA, and having secured a one-year agreement for the serving of these sets by its employees, Bell Atlantic no doubt believes—perhaps correctly—that it may thereafter be able to keep the government's CPE business on a more permanent basis. Bell Atlantic's marketing tactic may be admired for its ingenuity; but it is directly at odds with the purposes and principles underlying the decree.

As originally drafted by the parties, the consent decree prohibited the Operating Companies from both the manufacture and the marketing of CPE. As the Department of Justice explained again and again, since the Operating Companies will retain their monopoly "bottleneck" positions in the markets in which they will operate, they would with respect to CPE have both the incentive and the ability to duplicate the behavior attributed to the Bell System: they might subsidize the prices of their own equipment for sale to the public with revenues from their monopoly services; they might purchase their own equipment or that of favored manufacturers even if it was of lower quality or higher price than that made or sold by competitors; and they might supply their own manufacturing arms, in-house or otherwise, with information regarding interconnection and other standards not available to competitors in the CPE market.

---

or because it is governed by an independent board of outside directors. Compare Bell Atlantic Response at 3 note 4.

**7.** Section VII of the decree provides that the Court retains jurisdiction "for the purpose of enabling any of the parties to this [decree], *or, after the reorganization specified in section I, a BOC*" to apply for further orders or directions.

**8.** Bell Atlantic Response at 4–5. In a Supplemental Memorandum, Bell Atlantic finds comfort in a plan of reorganization provision which provides for the assignment to the Operating Companies of some employees with experience in the "provision" of CPE. That clause does not refer to installation and maintenance, and it

does not permit an Operating Company to keep whatever CPE-related employees it chooses to retain.

**9.** Bell Atlantic and the Department of Justice have suggested that considerations relating to the intra-corporate relationships within the Bell System may be for a chancery court in Delaware rather than this Court. But the AT & T corporate structure was and is the subject of this lawsuit and this reorganization. The decree, the plan of reorganization, and all the proceedings surrounding them, deal with the relationships between AT & T and its subsidiaries. It would be absurd to carve out this particular controversy and remand it to a state court in Delaware.

The Court recognized the validity of these concerns. With respect to the manufacture of CPE, it sustained the decree's complete ban. As regards marketing, the Court ruled that significant procompetitive and other public interest objectives could be achieved by permitting the Operating Companies to enter this field, and that the dangers feared by the Department of Justice could be reduced to tolerable levels by approval of decree provisions designed to minimize the advantages accruing to the Operating Companies from their monopoly position. Thus, the Court noted in its Memorandum of August 23, 1982, on a government motion for reconsideration, that the Operating Companies

> will be limited to a narrow range of products and services; they will not be permitted to manufacture CPE; and they will not have a base either in embedded equipment or in existing retail outlets or other marketing facilities. Thus, they will enter the CPE market with a zero market share—certainly a difficult starting point from which to establish a monopoly position.[10]

The decree, as modified and entered, thus constitutes a carefully balanced whole: the Operating Companies are allowed to market CPE notwithstanding the possible dangers stemming from their monopoly position and their pre-existing relationships, but they may do so only on a basis that includes safeguards against their exploitation of these built-in advantages to the detriment of competitors. Foremost among these safeguards are the requirement that the Operating Companies enter the CPE business with a zero market share and that they not carry over into the post-divestiture world the job functions and the employees related to CPE.

Bell Atlantic's actions, whether or not they violate specific terms of the decree or of the plan of reorganization (see Part I *supra*), represent a plain violation of this design, of these purposes. Throughout the history of the Tunney Act proceedings—in its consideration of the plan of reorganization as well as in its review of various requests for clarification, modification and waiver—the Court has consistently given substantial weight to the principles and purposes underlying the decree.[11] It will do so again in this instance.[12]

Whatever technical justifications have been advanced by Bell Atlantic in support of its dealings with GSA, it is difficult to believe that anyone could have seriously thought that this company had the right, consistently with the scheme of the decree, to sell the embedded CPE just a few days before it was required to surrender it to AT & T[13] and by this means to pyramid its position into long-term CPE marketing advantages.

This Court is firmly committed to the ability of the Operating Companies to market CPE once they become independent, if

---

**10.** *United States v. AT & T,* 1982–2 Trade Cas. p. 64,980 (D.D.C.1982). Elsewhere in the same Memorandum, the Court pointed out that AT & T will, among other things, "retain all the CPE located in the homes and businesses of the American public at the time of divestiture; and it will have ... control ... of the personnel necessary for the sale and marketing of this equipment."

**11.** For example, the Court assigned to the Operating Companies the Bell name and the Bell patents in substantial part so as to give meaning to that part of the decree which permits the Operating Companies to market CPE. See *United States v. Western Electric Co., supra,* 569 F.Supp. at 1079, 1087–88.

**12.** Bell Atlantic complains that if the GSA contract is assigned to AT & T, that company will learn such things as the usage made by Bell Atlantic of its Centrex machines. But AT & T could have had that kind of information at any time in the past for the asking. Moreover, such flow of information back and forth between and among the components of the Bell System is an inevitable by-product of the break-up. Bell Atlantic may be expected to receive as much (*e.g.,* patent, technical, management information) as it gives.

**13.** If Bell Atlantic had that right with respect to CPE, why would not every other Operating Company have that same right with respect to all the other assets (*e.g.,* switches, land, buildings, transmission facilities) that under the decree and the plan are to go to AT & T on January 1, 1984?

only because this is likely to strengthen their financial health and thus, depending upon the point of view, reduce upward pressures on local rates or eliminate an excuse for increases in those rates. But such result-oriented considerations must yield to the integrity of the judgments entered by the Court and to fairness to the parties to this litigation.

It is accordingly hereby ordered that Bell Atlantic shall forthwith assign and transfer to AT & T, effective as of the date of divestiture, its contract or contracts with GSA for the sale or maintenance of embedded business CPE, and that it shall likewise transfer to AT & T as of the date of divestiture the maintenance personnel related to such CPE.[14]

14. There is no need to order a rescission of the contract with GSA, and this might unnecessarily inconvenience the government and create problems for the employees assigned to this job. The Court also denies AT & T's various dis-covery-type requests upon Bell Atlantic's representation that AT & T will experience no difficulty receiving the necessary information on an informal basis.