UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court,
District of Columbia.

July 26, 1984.

Jeffrey Blumenfeld, U.S. Dept. of Justice, for the United States.

Howard Trienens, New York City, for AT & T.

Chester Kamin, Chicago, Ill., for MCI.

Robert V.R. Dalenberg, San Francisco, Cal., for Pacific Bell.

Norman C. Frost, Birmingham, Ala., for BellSouth Corp.

## OPINION

HAROLD H. GREENE, District Judge.

The Regional Holding Companies,[1] have requested the Court to waive the "line of business" restrictions in section II(D) of the decree so that they may pursue ventures other than the provision of local telephone service. These motions raise the question whether and the extent to which these companies shall be permitted to engage in new business enterprises—perhaps the most important issue to have arisen since the AT & T Plan of Reorganization was approved last year.[2]

Section II(D) of the decree mandates that

After completion of the reorganization ..., no [Operating Company] shall, directly or through any affiliated enterprise:

1. provide interexchange telecommunications services or information services;

2. manufacture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services); or

3. provide any other product or service, except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff.

Section VIII(C) provides for the removal of these restrictions under certain circumstances. Motions filed by the Regional Holding Companies or their affiliated Operating Companies request permission to engage in enterprises ranging from real estate investments to foreign business ventures, and the Court is advised that additional motions, for further diversification, will follow. Some of the proposed enterprises are related and some are unrelated to the telecommunications business.[3]

---

1. The twenty-two Operating Companies, the successors of the local affiliates of the Bell System, provide local telecommunications services and certain other services and products pursuant to the decree. Each of these local companies is now a subsidiary of one of seven Regional Holding Companies established by Part IV(A)(6) of the Plan of Reorganization. The Plan itself was approved by the Court on July 8, 1983. *United States v. Western Electric Co.*, 569 F.Supp. 1057 (D.D.C.1983), *aff'd sub nom. California v. United States, —— U.S. ——*, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

2. As one party has put it, resolution of this issue may represent the " 'second phase' restructuring of the American telecommunications industry." Department of Justice Memorandum of April 5, 1984, at 56.

3. The following waiver requests have been filed thus far: (1) Bell Atlantic's motion of January 26, 1984 to enter the equipment leasing market;

Shortly after the first waiver requests were filed, the Department of Justice suggested that the Court establish a general framework and standards for dealing with these requests. Because of the significance of the issues and because additional requests were certain to follow, the Court agreed that general guidelines might be appropriate in order to achieve substantial uniformity in treatment, to aid the Regional Holding Companies in framing future requests, and to assist the Court in its decisions. A briefing schedule was therefore established and oral argument was had on the general issues. This Opinion describes the standards and procedures the Court will follow in ruling on present and future motions for waivers.

I

*History of the Restrictions*

In deciding requests for waivers under section VIII(C), the Court must determine whether the petitioning Regional Holding Company has made "a showing" that "there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." The parties disagree not only on the factors the Court may consider in making its section VIII(C) determination; they also disagree on the question whether that sec-

tion establishes the exclusive standard for a removal of the line of business restrictions.

The Regional Holding Companies argue that such removal is contingent entirely on the anticipated antitrust consequences of their entry into a particular market; that the Court is not free to consider other provisions of the decree;[4] and that when the pending waiver requests are considered in light of the proper standard, all of them must be granted without conditions. The Department of Justice and others[5] maintain, however, that many, if not all, of the requests should be denied, if only because the Regional Holding Companies have failed to demonstrate that their entry into the markets they seek to penetrate is not likely to impede competition. Beyond that, these parties argue that the Court should refrain from taking a restricted view of its responsibilities but should measure the potential effect of entry on the decree's overall objectives.

The key remedy adopted in the decree for the elimination of anticompetitive conditions within the telecommunications industry was the divestiture of the Operating Companies from AT & T. As a regulated monopoly, AT & T had both the incentive and ability—through cross subsidization and various discriminatory actions related

(2) BellSouth's motion of January 27, 1984 to provide certain software programs and related services; (3) Pacific and Nevada Bell's motion of February 8, 1984 to enter into foreign business ventures; (4) Nynex's motion of February 15, 1984 to provide office equipment and related services; (5) BellSouth's motion of February 24, 1984 to bid on a request for proposal issued by NASA to provide communications services and equipment; (6) US West's motion of March 20, 1984, to provide real estate services and to engage in real estate transactions and investments; (7) Ameritech's motion of March 23, 1984 to provide computers and computer-based services to developers and tenants as part of shared-services arrangements for multi-tenant buildings; (8) Ameritech's motion of April 26, 1984 to provide consulting services to foreign telecommunications systems; and (9) NewVector's motion of April 20, 1984 to construct and operate a cellular radio system in the Gulf of Mexico (NewVector is a wholly-owned subsidiary of US West).

4. See, *e.g.,* Ameritech Memorandum of April 2, 1984 at 2 (proposal to tie waiver request to equal access compliance is "major and unjustified change in the present waiver standard"); Bell Atlantic Memorandum of March 23, 1984 at 10 ("the Decree standards for granting both section VIII(C) and Appendix B waivers are unambiguous and independent of each other"); and US West Memorandum of February 28, 1984 at 6 (in deciding waiver requests, the Court should focus on only the market the Operating Company seeks to enter, and not on the unrelated market that it is already in).

5. *E.g.,* MCI, Independent Data Communications Manufacturers Association, North American Telecommunications Association, National Cable Television Association, Computer and Communications Industry Association, and American Newspaper Publishers Association.

to interconnection—to use its control over the local exchange facilities to foreclose or impede competition in the several competitive or potentially competitive markets.[6] The functional separation of the Operating Companies from AT & T was designed to eliminate the potential for such anticompetitive behavior.

In order to prevent the occurrence or reoccurrence of anticompetitive conduct by the Operating Companies—each of which retains in its particular area a monopoly over local telecommunications service and thus has the potential for using its monopoly power to discriminate against others— the decree imposes several restrictions upon their activities. In fact, as originally drafted, the decree flatly prohibited these companies from engaging in any business other than that of supplying local telephone service.[7]

The Court rejected such a blanket restriction, reasoning that the mere theoretical ability to engage in anticompetitive conduct did not constitute a sufficient basis for prohibiting the companies from entering all competitive markets. In the Court's view, the test was to be a pragmatic one. The Operating Companies were different from AT & T—largely because of their smaller size and relative lack of complexity[8]—and they were therefore to be barred from competitive markets on a less rigid basis.

After examining the restrictions set forth in section II(D) of the proposed de-

cree in light of that standard, the Court rejected two of these restrictions—that on marketing of customer premises equipment and that on the publication of the Yellow Pages[9]—and it approved the remainder of the restrictions. In so doing, the Court further noted that

It is probable that, over time, the Operating Companies will lose the ability to leverage their monopoly power into the competitive markets from which they must now be barred. This change could occur as a result of technological developments which eliminate the Operating Companies' local exchange monopoly or from changes in the structures of the competitive markets. In either event, the need for the restrictions upheld in Subparts A through C will disappear . . . .

552 F.Supp. at 194–95.

Accordingly, the Court required the parties to incorporate into the decree a mechanism by which the line of business restrictions could be removed, and it stated that

the removal of the restrictions should be governed by the same standard which the Court has applied in determining whether they are required in the first instance.

552 F.Supp. at 195.

The parties accepted the section II(D)[10] and section VIII(C) modifications required by the Court. It was also understood that the restrictions would be removed altogeth-

---

6. *E.g.*, long distance service, equipment manufacture and sale.

7. The Department of Justice argued that such a rigid restriction was justified because the companies would have the incentive and the ability to leverage their monopoly power in the local exchange market to impede competition in the competitive markets by two types of behavior— subsidizing their prices in such markets with profits earned in the monopoly market, and restricting their competitors' access to the local distribution networks. This, of course, was the same type of anticompetitive conduct that was at issue in the *AT & T* case.

8. *United States v. Am. Tel. & Tel. Co.*, 552 F.Supp. 131, 187 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). On August 23, 1982, in denying the Department of Justice's

motion for reconsideration of the Court's ruling permitting the Operating Companies to market customer premises equipment, the Court noted, *inter alia,* that the Operating Companies

will be relatively small, geographically dispersed corporations. They will be limited to a narrow range of products and services, . . . [and they] will also lack the ability to use various components and affiliates in the pursuit and concealment of anti-competitive conduct.

Slip opinion at 3.

9. For the specific reasons for these modifications, see 552 F.Supp. at 191–94; see also note 77 *infra.*

10. See section VIII(A), (B).

er if the rationale therefor became outmoded by technical developments or changes in competitive conditions.[11] On that basis, the Department of Justice was required to report to the Court every three years concerning the continuing need for the retention of the restrictions.

It is in light of this history that the issues now before the Court must be analyzed.

## II

### Cross Subsidization

In one respect, the risk that a Regional Holding Company will use its monopoly power for anticompetitive purposes becomes more remote as the market it seeks to enter becomes increasingly unrelated to and independent of local exchange service. That is so because products or services in unrelated fields are not dependent upon interconnection to the companies' monopoly bottleneck facilities, and discriminatory access therefore cannot injure the manufacturers or sellers which compete with them. However, competition can be impeded as readily in another way—by cross subsidization, that is, by a subsidy to a new, competitive line of business with profits earned from or assets held by the existing, regulated monopoly line of business.

As long as a Regional Holding Company is engaged in both monopoly and competitive activities, it will have the incentive as well as the ability to "milk" the rate-of-return regulated monopoly affiliate to subsidize its competitive ventures and thereby to undersell its rivals in the markets where there is competition. For that reason, caution with respect to "outside" activities is always warranted, particularly in the case of wholesale diversification because the larger the scale and the greater the diversity of a company's activities, the more difficult it is to detect and to remedy cross subsidization between the various affiliates. Compare also note 8 *supra.* Indeed, widely diversified Regional Holding Companies could enjoy greater opportunities to cross subsidize than did the Bell System which, under the 1956 consent decree, was limited to a relatively narrow range of products and services.

Cross subsidization may take a variety of forms. One such practice would be the misallocation of common costs. To the extent that a Regional Holding Company used the same facilities, equipment, and personnel to serve both its regulated and its unregulated activities, it would have the ability to overallocate the costs assigned to the former in order to maximize the amount that would be passed on to the ratepayers (who have no choice but to pay).[12] Not only would this improper assignment of costs burden the ratepayers; it would also enable the company profitably to charge less for its competitive products and services than do its rivals who enjoy no such subsidy.

---

**11.** Rather than to attempt to draw a comprehensive definition of all the permissible activities in which an Operating Company could engage, the Court found adequate the standard for removal as it applied to the general line of business restriction. Not only would it have been difficult to draw such a line, but as the Department of Justice's remarks at the time indicate, it was also unnecessary because "there was no suggestion [in the comments received by the Department] that the BOCs would have any interest in entering such unrelated competitive businesses or that there would be any significant public benefit from such entry." See Response of the United States to Public Comments on Proposed Modification of Final Judgment of May 20, 1982 (Response to Public Comments) at 55. Accordingly, under the decree as modified, an Operating Company which sought to engage in an unrelated industry could petition the Court for removal of the restriction as it pertains to that industry "and if there was no realistic possibility of abuse of monopoly power, the Court could simply grant the petition." 552 F.Supp. at 195 n. 267.

**12.** Nynex's proposal for an office equipment venture illustrates this problem. Under that company's proposal, over 75 percent of the employees of its Business Information Systems Company (BISC) subsidiary will be located in a sales division that will also serve as the sales agent for its telephone exchange services. Under this arrangement, Nynex could easily manipulate the common costs of the BISC and Operating Companies so that the ratepayers would subsidize the office equipment business.

A Regional Holding Company could also subsidize its competitive ventures by transferring assets [13] from its regulated affiliates to its unregulated affiliates at less than their cost or below their market value.[14] Such a practice would not only adversely affect the ratepayers who ultimately fund the research and development costs of the transferred assets,[15] but it would, once again, impede fair and effective competition in the competitive market: this cross subsidization would give the company's unregulated enterprise an obvious and improper advantage over its competitors. Conversely, a regulated affiliate could "purchase" assets from the unregulated affiliate at a price above their market value and pass on the extra costs to the ratepayers.[16]

In addition to cross subsidization, a Regional Holding Company could impede competition in markets unrelated to telecommunications by exploiting the marketing advantages stemming from its local exchange monopoly. The company would have a unique advantage over its competitors if, for example, it "bundled" its regulated monopoly services with its competitive products or services, or if it advertised, and in fact provided to its customers in the competitive market, more timely telecommunications service, preferential access, or both.[17]

■ In response to these concerns, the Regional Holding Companies argue primarily that cross subsidization is not a competitive issue but a regulatory cost allocation matter for which regulatory sanctions and penalties already exist. In addition, they contend that, even if they did engage in such anticompetitive conduct, the appropriate remedy would be a new antitrust action, not a refusal to grant a waiver.[18] These arguments are entirely without merit.

The cross subsidization of competitive activities with profits earned from a regulated enterprise constitutes precisely the kind of conduct the decree was intended to curb, and for which the decree contains—in a denial of a section VIII(C) waiver request—a very precise remedy. There is therefore no reason or basis for turning elsewhere when such practices are threatened by organizations subject to the provisions of the decree.

That remedy, moreover, is preferable to a regulatory one. Cost missallocations and improper transfer pricing in interaffiliate

---

13. *E.g.,* property, facilities, financial resources, technical information, and contractual services.

14. An asset would be undervalued for competitive purposes, if the Operating Company was "paid" less by its unregulated affiliate than it would cost another entity to purchase the same asset.

15. An affiliate which develops an asset in its regulated market in anticipation of its potential use in the competitive market would have the incentive to add features or capabilities beyond those required for the provision of local telephone service in order to enhance the asset's market value. As a result, the ratepayers would subsidize the unregulated businesses by paying for "extras" which benefit only those businesses. Indeed, the ratepayers might bear the entire risk of researching and developing these assets because a Regional Holding Company would transfer from its regulated to its unregulated affiliate only those projects which turn out to be successful. Conversely, if the unregulated affiliate developed an asset and sold it to the Operating Company at the full cost of development, a cross subsidy would occur if the asset possessed

features or capabilities beyond those required for the provision of the local telephone service.

16. This pattern would be similar to what was called the "procurement" portion of the government's case against AT & T. The government argued that the combination of vertical integration and rate-of-return regulation tended to generate decisions by the Operating Companies to purchase equipment produced by Western Electric which was more expensive or of lesser quality than that produced by the general trade. The Operating Companies could afford to make such seemingly irrational decisions, it was said, because they could always reflect the extra cost of the equipment in their rates without suffering a diminution in overall revenues. See *United States v. Am. Tel. & Tel. Co.,* 524 F.Supp. 1336, 1373 (D.D.C.1981).

17. Such practices are especially likely to occur if the regulated and unregulated services are marketed by a single sales staff.

18. Ameritech Memorandum of April 2, 1984 at 7.

sales have proved difficult, if not impossible, to detect.[19] It is for that reason that regulatory oversight has not been in the past,[20] nor is it likely to be in the future, an adequate check against them; it is for that reason that section VIII(C) was incorporated in the decree; and it is for that reason, too, that the burden was placed on the Operating Companies to demonstrate the absence of an anticompetitive effect. By contrast, in a new antitrust action or in a regulatory proceeding the proponent of a restriction would have the burden of proof. In short, the prevention of cross subsidization and other anticompetitive practices is an appropriate and significant ingredient in any decision under section VIII(C).

It does not follow from what has been said that all waiver requests must or will be denied. As noted below (Part VII *infra*) some of the problems discussed above can be alleviated by the imposition of conditions or safeguards upon the grant of waivers. It is also apparent, however, that such safeguards or conditions alone are not likely to be adequate to resolve legitimate concerns in this sensitive field, where claims of cross subsidization have contributed to a massive restructuring of the entire telecommunications industry, and where considerable caution is warranted to avoid yet another upheaval.

Thus, what plainly needs to be done is to avoid a headlong rush by the Regional Holding Companies into diversification programs which, for the reasons stated, would offer them too many opportunities for anticompetitive conduct.[21] The Court will therefore require that the entry of these companies into competitive markets proceed at a measured pace (see pp. 872–873 *infra*). Additionally, as will now be seen, immediate, widespread diversification of the Regional Holding Companies would be at odds with other fundamental purposes of the decree.

### III

### *Public Policy Factors*

■ The Department of Justice and several of the intervenors[22] urge the Court not to take a restricted and isolated view of its responsibilities in passing upon requests for waivers but to consider the effect diversification would have on the overall purposes of the decree. The Regional Holding Companies vigorously disagree, contending that, absent a showing that their entry into a new market will have a specific, directly predictable, adverse effect on competition in that market, they must be granted waivers regardless of the impact on other aspects of the decree. There is thus an issue whether, in addition to the specific standard set forth in section VIII(C), the Court could and appropriately should take into account broader considerations, specifically those articulated in other parts of the decree (*e.g.*, the requirement of equal access) and those which are among the decree's dominant purposes (*e.g.*, the efficient, economical provision of local telephone service).[23] It is that issue to which the Court now turns.

There never was, nor could there ever have been, any doubt that the decree was to be interpreted and enforced not only in accordance with its literal terms but also in

---

19. There is no formula for allocating common costs among services, and, even if there were, the fact is that the Regional Holding Companies alone possess all the relevant cost information and have a great deal of discretion in the treatment of such costs.

20. The crux of the government's case against AT & T was that regulation had failed to safeguard competition from a powerful firm, engaged in both regulated monopoly and unregulated services, which had the incentive and the ability to use its regulated monopoly to impede competition in potentially competitive markets.

21. Section VIII(C), as indicated, requires a showing that "there is no substantial possibility" that the petitioning company "could" use its monopoly power to impede competition.

22. See note 5, *supra*.

23. To some extent, this dispute may be academic for, as noted above, even under the narrowest reading of section VIII(C) the Court could deny the various waiver requests. However, in the view of the Court, other factors merit consideration.

conformity with its principal purposes.[21] That, in fact, has been the uniform interpretive practice, acquiesced in and even requested at various times by all the parties.

Before the Court could approve the parties' proposed consent decree, it was required by the Tunney Act (15 U.S.C. § 16(e)) to determine whether the decree was "in the public interest."[25] In the course of the Tunney Act proceeding, the parties made a number of assurances and undertook to abide by certain principles.[26] The Court thereafter approved the decree, but it noted that its public interest determination necessarily rested on the premise that these assurances will be fully carried out and that the other principles included in the decree "will be implemented in the manner most consistent with its purposes." 552 F.Supp. at 214. However, because it was impossible to know whether this premise was well taken, the Court found it necessary to "retain the power to ensure that the parties comply in full with the principles mandated by the decree, both in formulating the plan of reorganization and in their conduct after divestiture." *Id.*

A number of times since then, often at the request of the Regional Holding Companies, the Court has had to resort to those principles and purposes in its continuing responsibility to give content to what in relation to the magnitude of the task—in essence, the restructuring of the nation's telecommunications industry—are necessarily somewhat sketchy provisions.[27]

For example, even before the proposed decree was approved, the Court required that it be modified to permit the Regional Holding Companies to publish the Yellow Pages and to market customer premises equipment, and it stated that this was being done to ensure the viability of the local companies and to reduce upward pressures on local telephone rates—both public interest considerations underlying the decree.[28] Further, as a condition of approval of the proposed consent decree, the Court required that it be modified to provide that the plan of reorganization shall not be implemented until approved by the Court "as being consistent with the provisions and principles of the decree." Section VIII(J).[29]

Again, when the Court was called upon to clarify how the Operating Companies

24. In a strictly technical sense, the purposes are not those of the decree but those of the parties and the Court which are embodied in the decree. However, for the sake of simplicity, the Court generally refers herein to the decree's purposes.

25. In exercising the Tunney Act responsibilities, the Court sought to achieve three principal objectives: (1) the promotion of fair competition in the telecommunications long distance and equipment markets; (2) the preservation of AT & T as a dynamic force, capable of research, manufacturing and marketing in a technologically advanced field; and (3) the protection of the principle of universal telephone service, accessible to all segments of the population regardless of income. 569 F.Supp. at 1120.

26. For example, AT & T assured the Court that it would assign to the Operating Companies sufficient facilities, personnel, systems, and rights to technical information so that they could effectively perform the function assigned to them—providing local telephone service. AT & T also gave a number of assurances concerning patent rights, and these were subsequently enforced by the Court. 569 F.Supp. at 1082-90.

27. In that single respect, the decree may be analogized to a piece of legislation.

28. 552 F.Supp. at 187-88.

29. In its consideration of the plan of reorganization, the bulk of the actions that the Court had to take to achieve consistency of the plan with the decree tended primarily to promote the vitality of the Operating Companies and the principle of universal service. 569 F.Supp. at 1121. These actions included the following: (1) the assignment of the "Bell" name and logo to the Operating Companies; (2) the imposition of the requirement that AT & T grant to the Operating Companies licenses to all patents acquired by the Bell System; (3) the grant of authority to the Operating Companies to perform their own Official Services functions; (4) the imposition of the requirement that AT & T stand as the ultimate guarantor of the costs of equal access and network reconfiguration; and (5) the approval of LATAs which avoid substantial, costly network rearrangements. *Id.*

should treat undesignated interexchange traffic, it looked not only to the language of the decree, but also to its purposes and to "various practical considerations as they affect the public." [30] In passing on so-called LATA issues, the Court considered whether the choices made by AT & T and the Department of Justice correctly reflected the principles of the decree, especially in the areas of competition and Operating Company viability.[31] And more recently, the Court permitted the Regional Holding Companies to offer mobile radio services beyond their strict boundaries;[32] it ruled at the request of a Regional Holding Company that the Federal Communications Commission could not indefinitely delay the approval of effective tariffs;[33] it permitted the Operating Companies to provide time and weather services;[34] it permitted two Operating Companies to provide FX service across LATA boundaries;[35] it precluded a Regional Operating Company from selling to the government its embedded customer premises equipment;[36] it granted certain motions for clarification and waivers or modifications of the decree;[37] and it approved an interim billing arrangement for intra-LATA 800 service.[38] In every one of these rulings, the Court was guided substantially by the decree's purposes.

Nothing in the decree even hints that the parties intended that the Court should ignore these kinds of considerations when it was called upon to decide line of business waiver requests. To the contrary. The standard which the Court applied in determining whether a particular line of business restriction was to be imposed upon the Regional Holding Companies consisted of three parts, one of which, of relevance here, was "the effect of the restrictions upon other important public policies." 552 F.Supp. at 187–88. And the Court explicitly stated that the removal of the restrictions would be governed by the same standard which it applied in determining whether they were required in the first instance. 552 F.Supp. at 195.[39]

The Regional Holding Companies rely to the contrary upon such cases as *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), but that reliance is misplaced. In *Armour*, the Supreme Court held that a decree which grants only injunctive relief could not subsequently be converted by the unilateral fiat of one party into one effecting a structural separation. This case differs from *Armour* in at least two critical respects. First, as indicated above, the Court's resort to the decree's purposes, in addition to its literal language, was contemplated and understood—in fact, provided for—by the par-

30. *United States v. Western Electric Co.*, 578 F.Supp. 668, 671 (D.D.C.1983).

31. 569 F.Supp. at 996–97. The Court rejected MCI's argument that the financial health of the Operating Companies was not a legitimate concern of the Court. The Court stated that it had to be free to consider the public interest in its broad sense as long as such consideration did not negate the objectives of the antitrust laws. 569 F.Supp. at 997. Among the other relevant factors the Court considered in ruling on the LATA applications, were (1) the minimization of service disruption to telephone subscribers; (2) the avoidance of costly network rearrangements; and (3) the establishment of LATAs of sufficient size to attract interexchange carriers. 569 F.Supp. at 996 n. 27.

32. *United States v. Western Electric Co.*, 578 F.Supp. 643, 652–53 (D.D.C.1983).

33. *United States v. Western Electric Co.*, 578 F.Supp. 653, 654–55 (D.D.C.1983).

34. *United States v. Western Electric Co.*, 578 F.Supp. 658, 660 (D.D.C.1983).

35. *United States v. Western Electric Co.*, 578 F.Supp. 662, 664–66 (D.D.C.1983).

36. *United States v. Western Electric Co.*, 578 F.Supp. 680, 684 (D.D.C.1983).

37. Memorandum Opinion of February 6, 1984 at 2.

38. Memorandum Opinion of May 4, 1984.

39. Indeed, the Regional Holding Companies have argued in their individual waiver requests that their entry into other markets would be in the public interest because it would increase competition and because diversification would enhance their economic viability.

ties from the very outset.[10] Second, as to one key factor—the timing of the entry of the Regional Holding Companies into new markets (see Part IV *infra*)—the three entities that were most directly involved in drafting the decree and therefore most aware of its purpose in that regard—the Court, the Department of Justice, and AT & T—are all in agreement as to what was intended. See pp. 858–859 *infra*.[41]

In short, when the Operating Companies argue that, in its consideration of motions for waiver of line of business restrictions, the Court may not consider policies that transcend the narrowest possible competition issues, it is they, rather than their opponents, that seek to transform the standard by which the decree was to be and has been interpreted. Accordingly, in passing upon such motions, the Court will take into account *inter alia*, the decree's fundamental principles and purposes.[42]

## IV

### *Equal Access*

■ Contrary to the claims of some of the Regional Holding Companies, the inclusion of section VIII(C) in the decree is not evidence of a general policy in favor of their diversification.[43] That provision was included so that these companies could, at some later time, engage in nonregulated activities on a carefully controlled basis. No one connected with the negotiation, the drafting, or the modification of the decree envisioned that the Regional Holding Companies would seek to enter new competitive markets on a broad scale within a few months, let alone a few weeks, after divestiture—before the implementation of equal access and before the companies' commitment to an efficient and economical telephone operation could be tested.

The Department of Justice reported in its Response to Public Comments filed on May 20, 1982 *supra* (at 55) that

there was no suggestion in the comments that the BOCs would have any interest in entering such unrelated competitive businesses or that there would be any significant public benefit from such entry.

Elsewhere in this Response (at 62) the Department went on to state that:

It is quite possible that, as technology evolves, the rationale for the restrictions will erode as the BOCs lose the ability to disadvantage competitors in these markets. As set out in its Competitive Impact Statement, the Department intends to review carefully the continuing need for the restrictions. In order to ensure that the Court is fully apprised of devel-

---

**40.** See *White v. Roughton,* 689 F.2d 118 (7th Cir.1982), where the court said

... it is not true that we must read one clause in one paragraph of the decree in isolation from the rest of the paragraph and the rest of the decree without reference to the decree's evident purpose.... We do not understand the Supreme Court [in *United States v. Armour & Co., infra*] to be saying that consent decrees should be interpreted as if their provisions were unmotivated, purposeless, and without context or that the "four corners" of the decree are really the "four corners" of each clause in the decree. The Court was saying that the relevant purposes in interpreting a consent decree (like any other contract) are the purposes embodied in the instrument rather than the maximum aspirations—which are bound to be inconsistent anyway—of the interested parties.

689 F.2d at 119–20; see also, *United States v. American Cyanamid Co.,* 719 F.2d 558 (2d Cir. 1983).

**41.** The recent decision of the Supreme Court in *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), accentuates this difference between *Armour* and the instant case. In *Stotts,* the Court concluded that the injunctive relief sought by one of the parties was improper because there was nothing in the express terms of the decree authorizing the affirmative remedy sought and there was no suggestion that the parties intended that such a remedy should ever be available. It is the Court's clear implication that if the parties had such an intent, the Court would have construed the decree in accordance therewith.

**42.** As will be seen, consideration of the broader public purposes yields the same result as section VIII(C)—a go slow approach to what, at first blush, appears to be a plan to diversify broadly the activities of the Regional Holding Companies. See also, note 23 *supra*.

**43.** See, *e.g.,* Nynex Memorandum of February 29, 1984 at 3.

opments in this area, the Department will undertake to make a formal report to the Court on the continuing need for the restrictions on the third anniversary of the date of divestiture, and every third year thereafter so long as the restrictions remain in force. In the event that the Department concludes in its report that the state of competition and technology is such that any or all of the restrictions should be lifted, it will move the Court for a modification of the Judgment to permit such activity by the BOCs. Similarly, when Howard Trienens, AT & T's general counsel and a principal negotiator and draftsman of the decree, was asked by the Court whether anyone had in mind that there would be many new Regional Holding Company ventures in such a relatively short time, he replied emphatically in the negative.[44] And this Court which, as a result of its authority to require modifications of the decree was directly involved in approving the decree and in defining its

meaning,[45]—which, indeed, drafted and required the parties to incorporate section VIII(C)—did not have the slightest belief or intention that within a very short period of time,[46] the Regional Holding Companies would seek to transform themselves from custodians of the nation's local telephone service into conglomerates for which such service was at best a pedestrian sideline. See Part V *infra.*[47]

The line of business restrictions—like the remainder of the decree—became effective on January 1, 1984. Those restrictions were necessarily based upon the premise that, as of that time, they constituted an essential ingredient of the decree. Yet none of the requests for waivers is accompanied by a showing or even an allegation of changed circumstances that would justify a departure from the restrictions. The factual assumptions and the rationale underlying the Court's findings that these restrictions are in the public interest therefore remain sound.[48]

**44.** See Transcript of April 11, 1984 hearing at 37.

**45.** The Court's Opinion of August 11, 1982 described in detail the provisions, the purposes, and the principles governing the decree.

**46.** The first waiver request by a Regional Holding Company was filed less than one month after divestiture. Request of Bell Atlantic dated January 26, 1984 for permission to enter into the equipment leasing market.

**47.** Therefore, even assuming *arguendo* that section VIII(C) does permit the Regional Holding Companies to enter non-telecommunications markets at will and that such entry would raise no competitive issues, the Regional Holding Companies would still not be entitled to grants of the current requests. For as *White v. Roughton, supra,* teaches, even where language is unambiguous, the duty of a court is

... to determine the intended rather than the literal meaning of the decree. The proposition advanced by the plaintiffs would be correct if we were construing a common carrier's tariff rather than a decree in the nature of a contract. See *Western Transport Co. v. Wilson & Co.,* 682 F.2d 1227, 1231 (1982). But the overriding purpose in construing a contract is to give effect to the mutual intent of the parties at the time the contract was made; and while the language of the contract is normally the best evidence of that intent, a

court can properly disregard even unambiguous language when it is convinced that the parties meant something different from what they said.... Determination that the parties have a principal purpose in common requires interpretation, but if such a purpose is disclosed further interpretation is guided by it. *"Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose."* 2 Restatement (Second) of Contracts § 202, comment c (1981) (emphasis added); see also 2 *id.* § 212, comment b.
689 F.2d at 120.

**48.** Ameritech argues that, unlike the restriction prohibiting AT & T from competing in the electronic publishing market for seven years, the Court did not establish any time-related standard with respect to section VIII(C) waiver requests. Thus, according to Ameritech, requests for removal of the line of business restrictions—even those seeking permission to provide interexchange services information services, or to manufacture CPE—do not depend on changed circumstances. The argument is totally without merit. The Court did not set a specific time limit on the line of business restrictions because it did not and could not know when the need for such restrictions would disappear. With respect to the electronic publishing field, it appeared that a seven-year period would probably be adequate to achieve the purposes of the limitation. See 552 F.Supp. at 180–86.

Moreover, there are substantial reasons for concluding that a wholesale departure from the status quo at this time would *not* be in the public interest or consistent with the intended purposes of the decree.

A principal problem is that the diversion of capital and managerial resources in the pursuit of outside ventures may impede the implementation of equal access,[49] and that this development, in turn, will hinder competition in the interexchange market. On that basis, some parties (*e.g.*, MCI) urge that the Regional Holding Companies be prohibited from entering new lines of business altogether until they have fully fulfilled their equal access obligations under the decree. The Department of Justice likewise emphasizes that these companies have an incentive to use available financial resources to enter new markets rather than to meet their equal access obligations and that, given such an incentive, they may implement equal access with substantially less vigor and speed.[50]

■ Some of the Regional Holding Companies argue that, because section VIII(C) itself does not specifically mention equal access, the Court may not even consider the possible effect that their entry into new markets will have on their ability to meet their equal access obligations. This argu-

ment necessarily assumes that the parties to the decree—AT & T and the Department of Justice—as well as the Court, contemplated that the Operating Companies would embark on a substantial diversification campaign shortly after divestiture and before equal access was implemented. As the Court noted above, nothing could be further from the truth.

■ In any event, the narrow approach of the Regional Holding Companies to section VIII(C) waivers is entirely unjustified. The decree's provisions are not independent clauses having no relation to one another but are interrelated components of a plan to reorganize the Bell System and hence—in effect—the nation's telecommunications industry.[51] The Court would be derelict in its duties if it did not consider the possible effect the Regional Holding Companies' entry into unrelated lines of business will have on other provisions of the decree—one of which requires the prompt implementation of equal access.[52] It was precisely this type of situation that the Court envisioned when it retained the power to ensure that the parties comply in full with the principles mandated by the decree, both in formulating the plan of reorganization and in their conduct after divestiture.[53]

**49.** Appendix B of the decree, 552 F.Supp. at 232–34.

**50.** As the Department has perceptively noted, a Regional Holding Company executive may advance more rapidly in the company hierarchy if he developed a new market in an interesting new field than if he faithfully worked to ensure that equal access was provided to the interexchange carriers—the sometime competitors of the Holding Company.

**51.** To illustrate. The line of business restrictions imposed on the Regional Holding Companies in section II(D) complement the structural changes in AT & T—namely, the divestiture of the local Operating Companies. The equal access provisions also complement the structural changes by prohibiting any disparities in interconnection which might result from an AT & T bias, and by ensuring that all interexchange and information services providers would compete on an equal basis. 552 F.Supp. at 195.

**52.** For the same reason, the Court will take into account a Regional Holding Company's invest-

ments in new businesses if that company seeks a waiver from its equal access obligations due to capital constraints.

**53.** Even if the Court were to ignore the remainder of the decree when it passed on requests for waivers of the line of business restrictions, equal access would still have to be considered under the rubric of the "imped[ing] competition" language of section VIII(C). If, for example, the Regional Holding Companies were permitted to provide interexchange services now or in the near future (as at least some of them seek to do—see Part VI *infra*), they would have both the incentive and ability to use their monopoly power to discriminate against their competitors by delaying their access to the local network or by providing poorer quality access. The companies' control over the implementation of equal access therefore bears directly on their incentive and ability to impede competition in this market.

The Regional Holding Companies contend next that ample financial and legal incentives already exist for equal access compliance.[54] Yet these companies seem to be already laying the groundwork for blaming their eventual failure to achieve equal access on other factors. Thus, they even now identify the following as potential obstacles to their provision of equal access: (1) the unavailability of switching equipment; (2) the inability of suppliers to provide equipment according to schedule; (3) an adequate supply of technical experts to engineer equal access; (4) regulatory requirements, including FCC reticence to allow recovery of equal access costs and ambiguity over AT & T's costs guarantees; and (5) the Department of Justice's failure to act on their equal access plans.[55] These careful predictions do not instill confidence that the capital and other resources of the Regional Holding Companies will be used to provide equal access and not for the pursuit of the outside ventures now being contemplated by these companies.

The companies finally claim that, when the Court approved the schedule for implementing equal access, it recognized that it "could not expect equal access to be achieved immediately or to be phased-in on a more expedited basis than is contemplated in the proposed decree."[56] That is quite correct. The Court has no intention of requiring the Operating Companies to provide equal access in advance of the deadlines set forth in section A(1) of Appendix B of the decree. But those deadlines stand, and the Court will prevent impediments to the implementation of equal access, including the diversion of needed capital and the distraction of management which would frustrate the scheduled transformation of the local network into an equal access network. Accordingly, the Court will closely scrutinize any waiver request filed before a Regional Holding Company has implemented equal access to ensure that, if granted, it would not interfere with the company's specific obligations under the decree.

V

*Provision of Local Telephone Service*

Under the decree, the Operating Companies' basic responsibility is to provide local telephone service to the public. The Plan of Reorganization, in turn, established the Regional Holding Companies for the primary purpose of serving the Operating Companies and facilitating their telecommunications functions. This is evident from the description in that plan of the structure and the responsibilities of these companies[37] and from section III of the decree itself.[38] As will now be seen, the vast and diverse programs the Regional Holding Companies are formulating, and the priorities the companies seem to be assigning to these programs, constitute a serious threat to their obligations under the decree and the implementing documents.

As evidenced both by the pending waiver requests and by reports of their inten-

---

**54.** Ameritech expects that once equal access is implemented, thirty to forty percent of its revenues will be derived from equal access charges. With respect to legal incentives, the decree mandates that equal access be achieved no later than September 1986. Ameritech Brief of March 23, 1984 at 17.

**55.** See Ameritech Memorandum of March 23, 1984 at 18; BellSouth Memorandum of March 23, 1984 at 5; Southwestern Bell Memorandum of March 23, 1984 at 22; and US West Memorandum of February 28, 1984 at 8.

**56.** 552 F.Supp. at 197.

**57.** Plan of Reorganization Part IV(A)(6). Only a single footnote (note 425) in the Plan mentions the non-telecommunications business and then only as an incidental function of the Regional Holding Companies ("the holding company structure also will permit the BOCs to carry on such other businesses as the Court may allow (in the event of a future modification of the Decree pursuant to Section VIII(C)").

**58.** Section III provides in pertinent part that the provisions of the decree "shall be binding upon [the Operating Companies], their affiliates, successors and assigns, officers, agents, servants, employees, and attorneys."

tions,[59] the Regional Holding Companies are expending significant managerial and other resources to discover and analyze new business opportunities.[60] Moreover, some of these companies candidly state that they regard the telephone business as of limited interest to them and the fate of the rate-payers as of little significance in the context of the decree. Thus, US West proclaims that the "Operating Companies owned by US West are in the telephone business rather than US West" and that "US West does not itself intend to be a telephone company."[61] Ameritech similarly asserts that, "[w]hile protecting ratepayers may be a worthy goal in the abstract, it is one that should be left to the regulators and the legislators to pursue as they see fit."[62] And Bell Atlantic argues that its waiver requests must be granted even if diversification into new business will raise the company's cost of capital and divert the attention of its management from providing telephone service, because in its view the effect of diversification on the ratepayers "is extraneous to the Decree" and is therefore not a legitimate criterion for ad-

judging applications under section VIII(C).[63]

The more the Regional Holding Companies diversify, the less central their telecommunications functions will obviously become to their corporate existence. To the extent that these companies perceive their new, unregulated businesses as more exciting, or more profitable than the provision of local telephone service to the American public—as they obviously do—it is inevitable that, should they be permitted to embark upon such business enterprises on a significant scale, their managerial talent and financial resources will be diverted from the business of providing such service. As a consequence, both the quality and the price of that service are bound to suffer. See also, note 122 *infra.*

Some parties allege that the attention the Operating Companies are presently giving to outside ventures has already had the effect of diminishing their interest in telephone service,[64] impairing the quality of service and increasing telephone rates. Some of the problems with local service reported in the press have been overstated.[65] Nevertheless, the Regional Holding

59. US West is "trying to get into *all* the unregulated areas." "The First Year of a New Era in Telecommunications: A Look at 1984," *Telephony,* Jan. 16, 1984 at 52 (MCI App. B13); "Ameritech clearly wants to rid itself of the trappings of a telephone company," "AT & T Breakup Clears New Lines," *Advertising Age,* Jan. 23, 1984 at M10, M11 (MCI App. B36); Bell Atlantic plans "some very fast diversification 'very soon after one one eighty four.'" "Bells, Bells, Bells," *Forbes,* Nov. 21, 1983, pp. 286, 288 (MCI App. B44); "'Telephone' is far too limiting" for Pacific Telesis. *Id.;* BellSouth wants to be in the long distance business in the next five years. "Bell Firms' Entry into Long Distance Is Opposed by U.S.," *Wall Street Journal,* February 24, 1984, at 40 (MCI App. B66); and Southwestern plans to become a "nationwide cellular player." "Ma Bell's Kids Fight for Position," *Fortune,* June 27, 1983, at 62, 67 (MCI App. B6).

60. Bell Atlantic has created a separate "Board of Bell Atlantic Venture Services, Inc." The responsibilities of the chairman of this Board include the evaluation of potential business ventures for Bell Atlantic Corporation. See waiver request of Bell Atlantic of January 26, 1984, affidavit of James H. Dickerson.

61. U.S. West Memorandum of February 28, 1984, at 7 n. 15, and 13. The chief executive

officer of Pacific Telesis is quoted to the same effect. MCI App. B44. US West has also expressed the hope that *all its income* would eventually come from its competitive enterprises. "How Some Key Players See the New Era." *Telephony,* January 16, 1984 at 56, 62 (MCI App. B18).

62. Ameritech Brief of April 2, 1984 at 9.

63. Bell Atlantic Brief of March 23, 1984 at 9, 13.

64. MCI complains that its request to BellSouth for specific traffic data made in July of 1983 was still outstanding at the time of the April 11, 1984 hearing on the pending requests, eight months later. Transcript of hearing at 30. Yet, according to the Department of Justice, BellSouth had approximately 36 employees available for work on its "outside" NASA proposal. Transcript of hearing at 71.

65. For example, mushrooming service and equipment options caused much of the customer confusion following divestiture. For the first time, customers now have a choice between buying and leasing their phone from a number of retailers, and they also have a choice among several long distance companies with different

Companies themselves concede that complaints over installation, maintenance, and service have increased,[66] and that appears plainly to be true.

■ One factor contributing to the service problems is inadequate coordination between the Regional Holding Companies and the interexchange carriers, principally AT & T. It should be clear—and if it is not, the Court is making it clear now—that the decree does not stand as an obstacle to such coordination (provided, of course, that it is extended to all interexchange carriers without discrimination). Some parties fear that the Regional Holding Companies may not be cooperating with these carriers as fully as they should because they see them as present or potential competitors, not only in those markets where such competition is appropriate,[67] but more broadly in the entire field of telecommunications (including interexchange services) and other markets in which these carriers—and AT & T in particular—are now beginning to compete. To the extent that the Regional Holding Companies' future business goals are responsible for the current service failures, the present Opinion may assist them in redirecting their focus on their primary role as providers of local telephone service.[68]

Diversification is also believed to have a negative effect on local rates. The Regional Holding Companies must obtain the funds for their new ventures from somewhere, and that source is likely to be the place where, as a consequence of an absence of competition, there is the least risk and the least effective resistance—the local ratepayers. In recent months, the public has witnessed a number of requests for local rate increases in all parts of the country. These requests are sometimes blamed on divestiture, but in fact they may stem from the need to raise capital for outside ventures, lavish advertising campaigns, and the construction of plants and the hiring of staff suitable for what the Regional Holding Companies consider themselves to be—diversified conglomerates which are fast outgrowing their modest and relatively pedestrian telephone origins.

■ The Regional Holding Companies assert that all these problems and fears are outweighed by the benefits they would derive from diversification, i.e., their ability to attract more capital and to increase revenue. In each of the waiver requests, the moving company argues that diversification will enhance its financial viability by reducing its overall risks. Diversified growth companies, it is said, are more attractive to securities investors and for that reason they are able to sell their stock at a higher price-earnings ratio, lowering their cost of equity capital. It follows, according to that line of reasoning, that a Regional Holding Company which is successful in diversifying could pass on its savings from lower capital costs to the ratepayers. These arguments are erroneous in every respect.

First. While the cost of capital depends on many different factors, some tangible and others intangible, there is no evidence that the Regional Holding Companies' cost of capital would decrease as a result of diversification. Because regulators are required by law to permit utilities to set rates which recover their cost of service—including the cost of capital—utilities have tradi-

---

rates and different levels of service. Additionally, monthly telephone bills tend to be more comprehensive, providing more detailed breakdowns of charges. The availability of greater choice and more information have heretofore always been regarded by the public in general, as well as by individual consumers, as favorable developments. Once the initial surprise over the availability of more options has abated, greater choice as a good rather than an evil may be expected to reassert itself.

66. Bell Atlantic states that 15 percent of its residence customers are dissatisfied with maintenance service. Memorandum of March 23, 1984 at 16.

67. *E.g.*, intra-LATA telephone service.

68. Once the companies achieve such a focus and service complaints diminish, they will be in a better position to request waivers of the line of business restrictions. See pp. 875 *infra*.

tionally been less risky [69] as investments than competitive ventures and their cost of capital from some sources has therefore tended to be lower.[70] Thus, to the extent that a Regional Holding Company raises funds jointly for both its competitive ventures and its regulated services, the cost of capital may be lower for the competitive venture (because it will be averaged with the lower capital costs of the regulated monopoly) but higher for the regulated telephone service. The ratepayers will then, in effect, be subsidizing the activities of the competitive venture by assuming, through higher interest rates, part of its cost. It follows that, if diversification of the Regional Holding Companies into new competitive ventures enhances their financial viability at all, the beneficiaries will more likely than not be these holding companies, their managers,[71] and their unregulated affiliates, not the Operating Companies which provide local telephone service.[72]

Second. Despite the representations now made by some of the Regional Holding Companies, it is unlikely that their new business ventures would produce supracompetitive profits which could be used for other purposes. As the Department of Justice correctly observes, if these companies were able to extract supracompetitive prices in these markets, it would indicate that they were abusing their monopoly power in the local exchange market to gain an unfair competitive advantage over their rivals.[73] Absent such anticompetitive practices, the companies' profits would probably not exceed those earned by others in the same markets, and little, if anything, would be left over to provide financial assistance to the companies' telephone subsidiaries.

Third. It may confidently be predicted that, even if the Regional Holding Companies could, somehow, reap significant profits from their outside ventures, they would not use them to benefit their regulated telephone affiliates. In fact, the opposite appears to be true. For example, Nynex candidly concedes, even boasts, that

[t]he earnings of the Operating Companies belong to the stockholders of these companies. Those earnings are not automatically invested in any particular enterprise and their use should not be con-

**69.** Ameritech alleges that the provision of local telephone service is becoming increasingly risky as a result of the growing uncertainties in the regulatory process and the rapid advance of bypass competition. Ameritech Brief of March 23, 1984 at 15. The regulatory process has unfortunately always been slow and uncertain. As for bypass, whatever its future, it is certainly not a broad threat to the viability of the local companies at the present time. In any event, the provision of local telephone service, which may be slightly more risky than it was when AT & T controlled virtually all aspects of the telecommunications market, is not nearly as risky as most of the competitive ventures that the Regional Holding Companies propose.

**70.** Utility financing has been predominantly debt financing, and it is generally believed that utility bonds present less risk than those issued by industrial firms. This is so because the demand for utility services is comparatively stable, regulation has supplanted some of the rigors of competition, and earnings, while not guaranteed, are given a greater degree of stability by regulation. P. Garfield & W. Lovejoy, *Public Utility Economics,* at 414–15. To be sure, some growth companies have been able to at-

tract capital at relatively low cost. But there is considerable question whether the speculation inherent in such ventures is appropriate if the cost of failure may be the stability of basic telephone service.

**71.** Some commentators believe that the recent surge in corporate takeover activity is caused more by solicitude for the interests of executives than for those of stockholders. Robert B. Reich, professor of business and public policy at Harvard, states that, quite simply, "[m]anagers get paid more if they preside over giant corporations." "Surge of Corporate Mergers Causing Concern on Wall Street" *New York Times,* July 3, 1984 at A1, D7. The transformation of a holding company administering local telephone affiliates into a broadly-diversified conglomerate would similarly benefit the managers of that company.

**72.** To be sure, this is not in itself a basis for denying waiver requests, but it does not suggest that broad diversification is necessarily in the interest of the telephone-using public or consistent with the decree.

**73.** Response to Public Comments, *supra* at 61.

trolled by the Department of Justice.[74] Similarly, US West has informed the Court that the use of the dividends it receives from the Operating Companies it owns is of concern to no one else.[75]

The Department of Justice cites an October 1982 Report of the Ad Hoc Committee on Utility Diversification of the National Association of Regulatory Utility Commissioners in which the Commissioners concluded that

[r]egulators should not divert diversified earnings from shareholders to subsidize rates, except as ratepayers may deserve a share of those earnings to the extent

that ratepayers are put at substantial or identifiable additional risk.

Report at 81 (quoted in Department of Justice Memorandum of February 21, 1984, at 8).[76]

Those predictions are also supported by recent experience. When the Court required AT & T to turn over its Yellow Pages operations to the Operating Companies,[77] it assumed that the revenues from directory advertising would continue to be included in the rate base of the Operating Companies, providing a subsidy to local rates.[78] Yet, the Regional Holding Compa-

**74.** Memorandum of March 23, 1984 at 2.

**75.** Reply Memorandum dated February 28, 1984 at 13.

**76.** H.R. 4102, the "Universal Telephone Service Preservation Act of 1983" which passed the U.S. House of Representatives on November 10, 1983, would amend section 201 of the Communications Act to prohibit the FCC and the state regulatory commissions from considering the revenues or profits derived from unregulated products or services (other than directory advertisements) by any exchange carrier in determining the revenue requirements of such carrier.

**77.** The present group of waiver requests is significantly different in several respects from the line of business restrictions on the publication of the Yellow Pages and the marketing of CPE, which the Court found not to be in the public interest. First, the Operating Companies were permitted to engage in these businesses only after the Court gave detailed consideration to the possible impact their entry would have on these two specific, relatively limited markets. Here, it is difficult, if not impossible, to foresee precisely what effect the present bulk of waiver requests will have if granted, particularly if they are merely the beginning of a massive diversification program. Second, Yellow Pages and the marketing of CPE are closely related to and have been traditionally associated with the telecommunications business, and there was thus no danger that the Operating Companies' basic telecommunications orientation would be jeopardized. Third, the capital, personnel, and other resources of the Operating Companies needed to publish the Yellow Pages and to market CPE are minimal and finite and, once again, their use does not pose a serious threat to the companies' telecommunications responsibilities. The present waiver requests, however, are not similarly limited; what is contemplated is broad-scale diversification which may eventually lead to a complete shift away from the telecommunications focus of the Regional Holding Compa-

nies. Fourth, because AT & T would continue to be the most formidable provider of CPE for a considerable period of time, and would most likely have become the sole publisher of Yellow Pages if the Operating Companies had not been permitted to publish them, these companies, with their existing relationship to telephone users, were the most likely entity to provide an effective counterbalance to AT & T's market strength and thereby to promote a genuinely competitive market. In contrast, the markets the Regional Holding Companies now seek to enter are already competitive.

**78.** In its August 11, 1982, Opinion of the Court explained why the Operating Companies should not be prohibited from publishing the Yellow Pages:

In addition to these factors directly related to competition, there are other reasons why the prohibition on publication of the Yellow Pages by the Operating Companies is not in the public interest. All those who have commented on or have studied the issue agree that the Yellow Pages provide a significant subsidy to local telephone rates. This subsidy would most likely continue if the Operating Companies were permitted to continue to publish the Yellow Pages.

The loss of this large subsidy would have important consequences for the rates for local telephone service. For example, the State of California claims that a two dollar increase in the rates for monthly telephone service would be necessary to offset the loss of revenues from directory advertising. Other states assert that increases of a similar magnitude would be required. Evidence submitted during the *AT & T* trial indicates that large rate increases of this type will reduce the number of households with telephones and increase the disparity, in terms of the availability of telephone service, between low income and well-off citizens. This result is clearly contrary to the goal of providing affordable telephone service for all Americans.

nies, or some of them, have breached that understanding. Instead of funnelling Yellow Pages revenues to the Operating Companies, they have created separate subsidiaries to handle their directory publishing operations [79] which do *not* feed the revenues from these operations into the rate base.[80]

In short, it is likely that the competitive ventures of the Regional Holding Companies, which rely in a number of ways on the funds generated by the ratepayers, will not share the profits from these ventures with the ratepayers.

In further support of their argument that diversification is in the public interest, the Regional Holding Companies contend that an enterprise which is narrowly limited in scope cannot attract the executive and other talent required for quality performance. Thus, Ameritech states that if it is limited to the provision of local telephone service, it will lose its "efficiency and dynamism" and become stagnant and inefficient.[81] Bell-South asserts that, if it is unable to respond to the technological changes and evolving market demands of exchange service, it may not only lose po-

tential revenue but it may also forfeit its base of large customers.[82] And Pacific Bell has informed the Court that the line of business restrictions are holding back its imagination and "flood of ideas." [83]

There is no reason why the "efficiency and dynamism" of Ameritech, Pacific Bell's "flood of ideas," and the energies of the other Regional Holding Companies could not be directed toward improving local telephone service rather than pursuing extraneous ventures. Much can and should be done through the application of new technology, administrative efficiency, and marketing techniques to reduce the cost of telephone service, to improve its quality, and to make new features available to the public. If the Regional Holding Companies were determined to bring about such developments, they might well reap substantial benefits, and continue to attract the talent they seek.

One needs only to contemplate the advances made in the customer premises equipment market and the variety of telephone equipment now available on store shelves in the wake of divestiture and hence of competition [84] to realize that,

552 F.Supp. 194 (footnotes omitted).

**79.** The FCC required all the Regional Holding Companies to file statements concerning their Yellow Pages operations. *In re Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies,* CC Docket No. 83–115, ¶ 75 n. 29, and ¶ 89, (December 30, 1983), reprinted in 49 Fed.Reg. 1190, 1202 n. 29, 1204 (January 10, 1984). Nynex, US West, BellSouth, Ameritech, and Southwestern Bell all responded that they had established directory publishing operations in separate subsidiaries.

**80.** Thus, Nynex has guaranteed to provide its regulated telephone companies with only a publishing fee—a fixed dollar amount—from its Yellow Pages revenue. That company contends that the telephone affiliates will benefit from this arrangement because the publishing costs associated with the Yellow Pages will be shifted to the separate subsidiary, and these affiliates, as well as the ratepayers, will be insulated from the risks of the directory publishing business, possible financial loss, and any fluctuation in the economy. But the revenues from the Yellow Pages have always far exceeded the costs of publication. Moreover, if there ever should

come a time when these operations are not profitable, the Regional Holding Companies could simply discontinue them. In short, the Nynex arrangement does not assist the ratepayers; it assists only Nynex.

**81.** Ameritech Response of March 23, 1984 at 16.

**82.** Bell South Response of March 23, 1984 at 15–16. In support of its motion to be permitted to bid on the NASA request, BellSouth argues that if it is not permitted to provide more than local telephone communications services in order to compete for a customer's business, it might lose that customer altogether. If this were the standard, the line of business restrictions would be meaningless, for this argument could almost always be made where a Regional Holding Company wished to branch out.

**83.** Transcript of April 11, 1984 hearing at 57.

**84.** Telephones are now available from hundreds of retailers at prices ranging from $10 to over $100. Features have recently appeared (*e.g.,* prerecorded numbers, automatic redial capacity, and the like) that were unavailable commercially in the days of the Bell monopoly.

where there is a will, there are ample opportunities for technological and other advances in the telecommunications markets themselves. The Regional Holding Companies are only limited in the services they can provide; they are not limited to any particular technology in providing those services.

■ The principal substantive purpose of the divestiture was to promote competition and hence to create conditions which will reduce the cost and improve the quality and reliability of the telephone service. For the reasons stated, the diversion of energy, talent, capital, and other resources by the Regional Holding Companies to pursue outside ventures on a substantial scale at this early stage has the potential for threatening that basic objective of the decree. The Court will therefore carefully scrutinize requests for waivers in accordance with the guidelines discussed below, to ensure that, if approved, they will not frustrate the implementation of the decree, the plan of reorganization, or the principles underlying the divestiture.

This does not mean that the Court will not allow the Regional Holding Companies to engage in other activities, particularly if such activities would tend to increase competition. However, if there is to be a "second phase" restructuring of the telecom-

munications industry (see note 2 *supra*), it will evolve only in a deliberate, cautious manner,[85] with every step tailored to ensure that the public's telephone service does not suffer, but improves in quality and price.

The Court will now consider the broad categories of the waiver requests.

## VI

### *Interexchange Service*

Considerable concern has been expressed by a number of parties that the Regional Holding Companies plan to enter the interexchange market. These concerns are not without basis. Only one Regional Holding Company has thus far explicitly sought a waiver that would permit it to enter into the interexchange market,[86] but several others have expressed a similar desire. See, *e.g.*, statement of Ameritech's Chairman William Weiss that the company wants to enter long-distance market and that the court-ordered restraints against such entry are "artificial" and "over time will fall away."[87] Similarly, Pacific Telesis has stated that it expects to connect all major California cities by optics by 1986.[88]

To approve these plans and applications would be to contravene the decree's prohibitions in the most direct and obvious way.[89] Indeed, even to leave open the pos-

---

**85.** It is ironic that Pacific Telesis, which opposes a cautious approach with respect to the line of business waivers, argues that this same approach is appropriate in the case of intra-LATA competition. In its brief to the California Public Utilities Commission, the company states that

> IntraLATA entry would add further confusion and uncertainty to what is, at least for most of us, a reorganization of the telecommunications industry that has already produced more than enough of both. This is a time for minimizing change and disruption—not for making that change and disruption as great as possible. This is *not* a time for diving head first into unknown water, particularly when the dive is unnecessary and when experience over the next few years will enable all of us to see the developing outlines of the new environment.

December 12, 1983 Reply Brief of Pacific Telephone & Telegraph Co., Docket OII 83–06–01,

*Order Instituting Investigation,* Public Utilities Commission of the State of California at 160.

**86.** See BellSouth's motion of March 26, 1984 to provide services and equipment to NASA. BellSouth states that it intends to enter the long distance business itself in the next five years. "Bell Firms' Entry into Long Distance Is Opposed by U.S.," *Wall Street Journal,* February 24, 1984 at 40 (MCI App. B66).

**87.** Mr. Weiss also states that Ameritech wants the ability to create "a whole network" for customers who have offices in Chicago, Detroit, or other cities. *Communications Daily,* February 10, 1984 at 4 (MCI App. B41).

**88.** "Pacific Tel Installs Fiber-Optic Local Loops," *Communications Week,* January 30, 1984 at C1 (MCI App. B56).

**89.** As the Court said on August 11, 1982,

> To permit the Operating Companies to compete in [the interexchange] market would be

sibility of Regional Holding Company entry into this market would have negative implications, for if the companies perceive themselves as future long distance competitors they will have incentives to spend ratepayer funds for long-distance network construction and to position themselves for successful entry by discriminating against other carriers in interconnection and by delaying their achievement of equal access.

█ It is therefore important that the Court state its position clearly. The Court will not even consider the substantive merits of a waiver request seeking permission to provide interexchange services until such time as the Regional Holding Companies lose their bottleneck monopolies and there is substantial competition in local telecommunications service. That is not now.[90] The BellSouth motion for a waiver with respect to the NASA contract is therefore denied.[91]

Similar considerations govern the appropriateness of entry of the Regional Holding Companies into the information services and equipment manufacturing markets. No significant technological or structural changes have occurred in these markets to justify a relaxation of these line of business restrictions, and no requests for waivers in these markets will be considered

unless and until such changes have taken place.

## VII

### Safeguards and Conditions

For the reasons stated, the pending waiver requests, and presumably the requests which are bound to follow, present such anticompetitive and other problems that the Court could grant them only with safeguards which would minimize these problems. The Department of Justice has suggested several safeguards of a structural nature which, as noted *infra*, the Court has carefully considered.

Before discussing specifics, however, it is necessary to consider first several general objections advanced by the Regional Holding Companies to the principle of conditions or safeguards.

█ First. Relying on *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), the companies contend that an integrated firm may, without violating the antitrust laws, permit one of its departments to benefit from association with another which possesses a monopoly in its own market, and that structural safeguards are therefore improper. The rule of *Berkey*, whatever it may be,[92] is of no relevance to the issue before the Court. The standard of the decree in this case is

to undermine the very purpose of the proposed decree—to create a truly competitive environment in the telecommunications industry.
552 F.Supp. at 188. It is surprising that the Regional Holding Companies, in their zeal to diversify, are not inhibited even by this clear prohibition.

**90.** The companies argue that the threat of bypass is already eroding their control over the local exchange monopoly. However, at present, bypass affects only a small percentage of their customers; the Regional Holding Companies will for the time being continue to be the only meaningful providers of local service for the vast majority of subscribers.

**91.** Accordingly, there is no need to follow the procedure established in Part VIII *infra* with respect to this waiver request.
The Regional Holding Companies complain that the Court did not require changed circumstances when it granted them permission under

section VIII(C) to provide cellular radio services across LATA boundaries in certain areas (see Order of November 11, 1983) and when it granted a waiver permitting them to provide time and weather services (see Order of December 7, 1983). However, in these prior petitions the companies did not seek to enter into entirely new businesses but asked only for transitional rules to allow them to continue existing network arrangements, to grandfather in existing services (*e.g.*, time and weather), and to adopt exchange area boundaries that reflected the needs of their mobile radio service.

**92.** The court in that case found that the use of monopoly power attained in one market to gain a competitive advantage in another violates section 2 of the Sherman Act even if there is no attempt to monopolize the second market. Said the court, "[i]t is the use of economic power that creates the liability." 603 F.2d at 276.

not whether the proposed activities would rise to the level of an actionable antitrust violation but merely whether there is a substantial possibility that the Operating Companies "could impede competition." [93] The line of business restrictions of section II(D), together with the standard for removal in section VIII(C), are prophylactic measures designed to prevent the Regional Holding Companies from abusing their power over the local telephone monopoly in any way. If the level of the prohibited activity had to rise to that of an antitrust violation, these provisions would have been unnecessary and redundant.

■ Moreover, under section VIII(C), the burden is on the petitioning Regional Holding Company, not, as in an antitrust case, on the Department of Justice or a private plaintiff. [94] In order to meet this burden, a company must demonstrate that it could not use its local telecommunications monopoly to obtain an unfair competitive advantage in a new market through cross subsidization or other anticompetitive behavior. In the absence of such a showing, the decree presumes that the potential for harm to competition outweighs any of the claimed benefits or efficiencies that may result from diversification. [95]

Second. The Regional Holding Companies claim next that the imposition of any safeguard, beyond those adopted voluntarily by a particular company, constitutes regulation and would, as one of them put it, "thrust this Court into the heart of the regulatory process." [96] However, it was because of the shortcomings of the regulatory process that the government brought the *AT & T* lawsuit and that the Court approved, as in the public interest, the divestiture and other relief. [97] There is nothing to indicate that a key assumption underlying the decree—that state and federal regulation alone cannot eliminate the possibility of anticompetitive abuses by the Operating Companies—is no longer valid. To the contrary. Those state regulatory commissions which have filed comments with the Court on the pending waiver requests are unanimous in their conclusion that they would be unable to prevent the allocation of competitive costs to the rate base. [98]

In any event, regulators would be concerned with but one facet of cross subsidization—the Operating Companies' extraction of excess revenues from the rate

---

93. For example, the allocation of common costs from a competitive to a regulated market in order to create additional profits in the former at ratepayers' expense may or may not violate the antitrust laws, but to the extent that the cross-subsidized venture is able to divert sales from its more efficient rivals, it impedes competition.

94. That burden was imposed as part of a consent decree which, while not an admission of liability by AT & T on its own behalf or on behalf of its affiliated companies, avoided a judgment on the merits which conceivably could have established such liability.

95. Additionally, as discussed in Part V *supra*, the Court's concerns are not limited to competitive issues strictly speaking.

96. Nynex Memorandum of February 29, 1984 at 8. In support of this proposition, the Regional Holding Companies argue that problems associated with allocating costs between competitive and regulated activities are matters within the jurisdiction of the regulatory bodies, and that the Court should presume administrative regularity and defer to these bodies.

97. See 552 F.Supp. at 187 n. 229 ("[i]f regulation could effectively prevent these practices, there would have been no need for the *AT & T* action").

98. Brief of Vermont Public Service Board dated March 23, 1984 (concurs in concerns raised by the Department of Justice over cross-subsidization and expresses the extremely limited scope of the state regulators for addressing issues before the Court); brief of Massachusetts Department of Public Utilities dated March 23, 1984 (regulatory oversight alone cannot provide adequate protection of public policy interests concerning businesses established under section VIII(C) of the decree); brief of Public Service Commission of Kentucky dated March 23, 1984 (supports the imposition of the conditions advocated by the Department of Justice); and brief of State of Michigan and Michigan Public Service Commission dated March 23, 1984 (Michigan is vitally concerned with the effects of Operating Company diversification on ratepayers and fully concurs with the positions and guidelines of the Department of Justice).

base—and not with the use of those revenues to impede competition by subsidizing competitive activities.

■■■ Third. The Regional Holding Companies claim that, by adopting specific safeguards, the Court would be improperly adding new and different provisions to the decree. Part III *supra* discusses the distinction between the imposition of new provisions and an interpretation of the decree in light of its governing purposes. The guidelines enumerated herein simply implement the Court's responsibility to pass upon waiver applications as required by the decree.[99] Because of the variety and complexity of the issues raised by these applications,[100] the Court must have the option of conditioning its approval upon the adoption of conditions or safeguards.[101]

The Department of Justice has recommended that the Court impose a number of very specific conditions or safeguards, as follows: (1) establishment by the petitioning Regional Holding Company of a separate subsidiary to conduct competitive activities; (2) separation of the credit underlying the competitive activities from that which supports the Operating Companies; (3) prohibition on the sharing of personnel, equipment, facilities, and services [102] between the Operating Companies and the competitive enterprises; (4) prohibition on the transfer of any asset or resource developed by an Operating Company to its affiliate engaged in competitive enterprises; (5) minimization of the number and dollar value of any transactions between the two sets of enterprises; (6) imposition upon the competitive enterprises of the same visitorial and investigative provisions which apply to the Operating Companies; (7) annual certification by the chief executive officer of a Regional Holding Company that the company has conformed to the conditions governing its entry into new line of businesses; and (8) reservation by the Court of the authority to modify or withdraw the waiver at a later date.

■■■ The Court has considered these proposals in light of the objections filed by the Regional Holding Companies, and it has concluded that the following four conditions are adequate and will be required.

First. It is generally agreed that if the Regional Holding Companies conducted competitive activities through separate subsidiaries, intracompany transactions would become more apparent and thus cross subsidization and other anticompetitive conduct could more easily be prevented or

---

99. See Order of November 1, 1983, granting the Operating Companies permission pursuant to section VIII(C) to offer mobile radio services across LATA boundaries. 578 F.Supp. 643 (D.D. C.1983). Because the companies had the incentive and ability to engage in various types of anticompetitive conduct in the cellular radio field, the Court imposed three conditions upon the grant of their petition. First, the companies are required to offer each non-wireline mobile radio licensee interconnection on the same terms and conditions as they provide to their own mobile radio systems. Second, the companies are required to provide access to their own regional cellular corporations on the same terms—including price—as are offered to competing cellular systems. Third, the companies are required to lease all inter-LATA facilities for their mobile radio systems from interexchange carriers on the same terms as are offered to their competitors. 578 F.Supp. 651–652.

100. The question whether a particular venture raises a substantial possibility of impeding competition, or jeopardizes other provisions and principles of the decree, depends upon a variety of factors, including the particular characteristics of the market, the details of the proposed operation, and the corporate configuration.

101. The Regional Holding Companies are free, of course, to submit their requests in whatever form they wish. However, these companies have the burden under the decree of proving that their entry into a particular market will not impede competition and that it will not otherwise conflict with the provisions and purposes of the decree. To the extent that the waiver requests incorporate the safeguards here discussed, the companies will be in a better position to make the requisite showing and to receive the requisite approval.

The applicants would obviously not benefit from a process which required them to submit their applications without any appreciation of the standards the Court expects to apply.

102. The Department would exempt treasury, legal, tax, and auditing services.

rectified.[103] The Regional Holding Companies themselves appear to acknowledge that such structural measures are a necessary safeguard.[104] Accordingly, while, as a general matter, the Court is not eager to require the establishment of separate subsidiaries,[105] that measure is warranted in this situation, and it will be required.

Second. The use of the Operating Companies' financial resources or credit to finance new ventures creates an obvious potential for anticompetitive cross subsidization. It also tends to jeopardize the financial soundness of the Operating Companies for purposes unrelated to their own enterprises. The Court will therefore approve waiver applications only if they incorporate provisions which will ensure that subsidiaries of the Regional Holding Companies engaged in competitive enterprises obtain

their own debt financing on their own credit and that no entity affiliated with the Regional Holding Company will guarantee the debt in a manner that would permit a creditor, on default, to have recourse to the assets of an Operating Company.[106]

Third. In order to prevent cross subsidization by widely diversified holding companies (see pp. 853–855 *supra*), to implement the decree's equal access provisions (see pp. 858–861 *supra*), and to protect the nation's telephone service from injury due to lack of attention or the absence of a sound financial base (see pp. 861–866 *supra*), the Court will require that the bulk of the investments of the Regional Holding Companies remain in decree-related activities. Accordingly, the Court will not, for the present,[107] grant line of busi-

**103.** The FCC, which has jurisdiction to police cross subsidization from the interstate rate base, has required the Operating Companies to establish separate corporate entities to provide CPE, enhanced services, and cellular radio, and it has preempted the States concerning the terms and conditions governing these separate entities. Report and Order CC Docket 83–115 (December 30, 1983) note 79 *supra* at ¶ 35.

**104.** Every waiver request submitted to the Court by the Regional Holding Companies contemplates that a separate corporate entity will provide the competitive products and services. See, *e.g.,*

Bell Atlantic's request of January 26, 1984 at 6 (Bell Atlantic states that its equipment leasing business will be operated as a separate profit center in a separate subsidiary);
BellSouth's request of January 27, 1984 at 1 (BellSouth would establish a wholly-owned corporate subsidiary to license software programs and to provide related services);
Pacific Bell's request of February 8, 1984 at 2 (Pacific's foreign business ventures will be pursued by one or more separate corporate subsidiaries);
Nynex's request of February 15, 1984 at 2 (Nynex's wholly-owned subsidiary, Nynex Business Information Systems Company, would provide related office communications equipment);
BellSouth's request of February 24, 1984 at 3 (a fully-separated subsidiary of BellSouth would respond to the NASA request for proposal);
U.S. West request of March 20, 1984 at 1 (U.S. West would engage in real estate transactions and investments through a separate subsidi-

ary corporation unrelated to its operating telephone companies);
Ameritech's request of March 23, 1984 at 1 (Ameritech "companies" would provide shared telecommunications and related services for multi-tenant buildings);
NewVector's request of April 20, 1984 at 1 (NewVector, a wholly-owned subsidiary of U.S. West, would construct and operate a cellular radio service in the Gulf of Mexico); and
Ameritech's request of April 26, 1984 at 1–2 (Ameritech Development Corp., a fully-separated subsidiary of Ameritech, would provide foreign consulting services).

**105.** 552 F.Supp. at 193 n. 251.

**106.** To be sure, in order to raise equity capital to invest in a new subsidiary, the Regional Holding Company would have to rely to some extent on the credit of the Operating Companies because the Regional Holding Companies are the only entities with common stock registered with the Securities and Exchange Commission.

**107.** When the commitment of the Regional Holding Companies to their basic telecommunications functions—to low price and high quality telephone service—and to the avoidance of anticompetitive conduct is plainly established, this standard may be relaxed. And, of course, when technology and market conditions have changed to a point where the Operating Companies no longer have what, as a practical matter, is a monopoly over local telecommunications service, the line of business restrictions will have outlived their usefulness and they will be removed altogether.

ness waivers for activities the total estimated net revenues of which exceed ten percent of a Regional Holding Company's total estimated net revenues.[108]

Fourth. Each Regional Holding Company seeking a waiver will be required to agree in its application that the monitoring and visitorial provisions of section VI of the decree apply to its proposed competitive activities. This will enable the Department of Justice to monitor compliance with the order granting the waiver and to report to the Court in the event that there are violations.[109]

In the view of the Court, these safeguards are adequate to protect the integrity of the decree in the respects discussed in this Opinion. Some of the additional conditions proposed by the Department of Justice would involve the Court too deeply in the internal operations of the Regional Holding Companies; others would not be readily enforceable; [110] and still others are unnecessary in view of the unambiguous requirements of the decree.[111]

---

**108.** This limitation should not undermine the current plans of the Regional Holding Companies. The companies have represented to the Court that the diversification requests now pending involve relatively minor expenditures. See, *e.g.*, Bell Atlantic's estimate that the proposed competitive ventures will yield less than one percent of the net revenues currently derived from telephone service. (Bell Atlantic Memorandum of March 23, 1984 at 15.)

**109.** It is claimed that even now some of the Regional Holding Companies are entering businesses barred to them under section II(D) of the decree without first securing waivers from the Court. See MCI Response Memorandum of March 23, 1984; see also *Telecom Market Survey*, June 15, 1984 at 1 ("At least two of the regional Bell operating companies—Nynex and Pacific Telesis—have moved ahead with plans to enter international markets without waiting for the blessing of [the] U.S. District Court"). Needless to say, violations of the decree, including violations of section II(D), constitute contempt of court. See, *e.g.*, section V(2)(4) of the decree.

**110.** It would be difficult to prescribe precisely the extent to which regulated and competitive enterprises could share personnel, equipment, facilities, and services. Indeed, as noted, the Department of Justice itself would exempt treasury, tax, legal, and auditing services. Similarly, it would be difficult to enforce the proposed requirement that the "number and dollar value" of transactions between the two sets of affiliates should be minimized. See also, CC Docket No. 83–115, Report and Order (December 30, 1983) at ¶ 49 (In imposing certain separation requirements on the Operating Companies for their CPE activities, the FCC noted that "[a]ccounting separation can often be more difficult to oversee, and can require far more intrusive monitoring effect than does the monitoring of structural separation conditions."). None of this should be taken to mean that a Regional Holding Company is authorized to engage in these or other practices to cross subsi-

dize competitive ventures or to otherwise impede competition; it only means that they will not be affirmatively incorporated into the orders granting waivers.

**111.** For example, it is not necessary to require the Regional Holding Companies' chief executive officers to certify that the companies they head are complying with the decree. As stated above, the Court rejects entirely the attempt of some Regional Holding Companies to separate themselves from the decree and its obligations. These companies and their executives are required by law to comply with and abide by the provisions of the decree, and a special certification would therefore be redundant. Moreover, section VI(A)(2) of the decree provides that upon the written request of the Attorney General, the Operating Company "shall submit such written reports, under oath if requested, with respect to any of the matters contained in [the decree] as may be requested."

As for the Department of Justice proposal that the Court reserve the authority to withdraw or modify waivers, it is likewise unnecessary (as well as being inappropriately intrusive of the companies' independence of planning and action). The percentage limitation imposed by the Court will ensure that the companies' outside ventures do not get out of hand. Moreover, adequate safeguards exist under the decree to deal with violations.

However, in the event that ventures for which waivers have been granted appear to exceed the ten percent limit prescribed above, the Court may, on application of any party, determine whether, on balance, the desirability of avoiding intrusive interference by the Court with ongoing Regional Holding Company operations outweighs possible jeopardy to the provisions and purposes of the decree. Depending upon the decision, waivers may be withdrawn or modified. In such a proceeding, the Court will consider, *inter alia*, the record of the particular Regional Holding Company with respect to these provisions and purposes.

## VIII

### *Procedures*

The Court has received a number of suggestions concerning procedures for dealing with present and future requests for waivers of the line of business restrictions.[112] In order to encourage informal negotiation and resolution, to avoid inundation of the Court with requests, and to make use of the expertise of the Department of Justice,[113] all such requests will be initially referred to the Department of Justice, as follows.[114]

A Regional Holding Company seeking a waiver of the line of business restrictions of the decree shall submit its request to the Department of Justice, together with a detailed proposal which should include the products or services to be offered, the means by which they would be offered, and the conditions proposed for avoiding the problems discussed in this Opinion.[115] The Department of Justice, guided by the principles expressed in this Opinion, will consider the requests formally or informally with the requesting Regional Holding Company and all other interested parties.[116]

If the Department concludes that the Regional Holding Company has met its burden as explained herein and concurs in the requested waiver, it shall submit to the Court a proposal for an appropriate order. That order will be entered as the order of the Court unless an interested party files an objection or the Court *sua sponte* expresses reservations. If the Department does not concur in the request, it shall submit the proposed waiver request to the Court for its decision, together with its own comments, and any supporting and opposing materials it may have received. The Court will at that juncture establish a pro-

112. BellSouth and Pacific Bell have proposed a bifurcation of waiver requests into two categories: those falling under section II(D)(1) and (2) on the one hand, and those falling under section II(D)(3) on the other. The Court would review and decide the former category of requests on a case-by-case basis, while requests in the latter would be reviewed only by the Department of Justice to ensure that certain structural separation conditions were satisfied. If the Department found that the structural conditions provided sufficient protection against the Operating Company's use of its monopoly over the local exchange to impede competition in the new market, no motion to the Court would be filed. For the reasons discussed above, this proposal is entirely unsatisfactory.

Bell Atlantic suggests that the Court appoint a special master to conduct proceedings with public participation and to make findings of fact concerning the proposed market entry. On the basis of these factual findings, the Court would decide whether there was any substantial possibility that the particular Regional Holding Company would impede competition in the new market. This procedure would be cumbersome and expensive without significant countervailing gain, for the Court would still have to decide all the waivers requests, and the special master would thus only add another procedural layer.

MCI suggests that the Court require the Regional Holding Companies to obtain a waiver for all new business ventures prior to engaging in any significant research or planning. This request is not only unrealistic, but it would also unduly burden the companies, interested parties who would wish to comment on particular ventures, and the Court. Moreover, the purpose of the present Opinion is to provide the Regional Holding Companies with guidance concerning the factors the Court will consider in ruling on their waiver requests, and it therefore should assist everyone's planning.

113. Since the potential markets for possible Regional Holding Company expansion are as varied as the American economy, some screening to take account of special circumstances and conditions will obviously be helpful.

114. This procedure is similar to the procedure established in the Memorandum Order of March 15, 1984, for the reference of requests for the adjustment of LATA boundaries, the association or disassociation of Bell and Independent territories, and the assignment of individual assets to the Department of Justice.

115. Copies of the proposal shall be served on the parties and on the other Regional Holding Companies.

116. The Department would be expected to discuss and consider such subjects as the form of the separate subsidiaries; measures that can be taken with respect to corporate structure; and other measures that can be taken to ensure, to the extent possible, against the improper sharing and transfers of assets and personnel. The Department should also consult with and bring into the proceeding for purposes of a particular request those companies and trade associations which would be directly affected by a Regional Holding Company's entry into the particular market.

cedure for further briefing, and possibly oral argument, to consider the views of all interested parties.

All currently pending waiver requests are herewith transmitted to the Department of Justice for its analysis and report to the Court in accordance with the procedure set forth above.[117] In view of the length of time these requests have been pending, the Department should endeavor to return these requests to the Court with its views within thirty days hereof.

## IX

### Conclusion

■ The decree was entered under the Sherman Act to eliminate anticompetitive conditions in the telecommunications industry. Within that legal framework, the bedrock purpose of the decree is to create conditions that will reduce the cost and improve the quality of telecommunications products and services.[118] Under the decree, the Regional Holding Companies play an essential role—they are to provide efficient, economical, and, if possible, technologically advanced local telephone service. Their role is not to provide a source of ratepayer funds, credit, and other assets to finance competitive ventures, nor were they meant to be vast conglomerates in which telephone service is relegated to a subordinate place. Yet that is what is threatened by the broad diversification efforts presently under way. This conclusion is reinforced by the lack of restraint some of the Regional Holding Companies have shown in their desire to transform themselves rapidly from local telecommunications organizations into seven diversified "Bell Systems." [119]

The decree contemplates that AT & T, as a company now engaged in competitive business, could enter various new fields as it sees fit; it did not contemplate such entry for the Regional Holding Companies except on a limited and slowly-evolving basis. The reason is simple: these companies, unlike AT & T, retain what is in law and in reality a monopoly over a critical aspect of the nation's telephone service.

The Court embraced diversification as it applies to AT & T,[120] reasoning that, should that company squander its resources on unprofitable non-telecommunications ventures, raise its rates, or fail to render quality service, its customers could easily take their business to one of its long distance or equipment competitors.[121] That is not so, however, with respect to the customers of the Operating Companies. These companies are at present the only entities with the license and the capacity to provide local telephone service to the general public.

117. It may well be that, with the safeguards discussed in section VIII *supra,* most of these requests will be granted.

118. The antitrust laws do not operate in a vacuum, nor do they represent a mere legal theory of interest only to scholars. Those laws are the result of policy judgments made by this nation's lawmakers that, absent special circumstances, competition is more likely than other policies to achieve the best allocation of resources, the lowest prices, the highest quality, and the greatest material progress. That judgment has been vindicated in countless markets, from ball point pens to sophisticated computers. The decree in this case is merely an application of that policy to the telecommunications industry.

119. As discussed above, some of these companies are seeking to enter the long distance business which under the most liberal interpretation of the decree is clearly forbidden to them; others are declining to earmark Yellow Pages revenues to hold down telephone rates; and still others have plans to deemphasize telephone service entirely in favor of other enterprises. It is difficult to escape the conclusion that these companies are generally determined, in a variety of ways, to give first priority to "outside" business ventures which are to be financed with ratepayer dollars but the profits from which are destined for the companies' competitive enterprises.

120. The Court had no difficulty approving removal of the provisions of the 1956 consent decree which restricted AT & T to the provision of common carrier communications services. 552 F.Supp. at 178–79.

121. The Court notes that, before AT & T was allowed to diversify, it had to give up the same bottleneck monopoly which the Regional Holding Companies now hold. 552 F.Supp. at 178 n. 199.

Thus, if they neglect their responsibilities in that regard in order to pursue what they may consider more interesting ventures, or if they are diverted from those responsibilities by unrelated or speculative business objectives,[122] the public, unable to go elsewhere, will suffer in higher rates, deteriorating service, or both. Such a result would be entirely inconsistent with the basic purposes of the decree,[123] and the Court will not approve requests which would help to bring it about.[124]

Beyond these considerations, there is the overriding principle that the Court is obligated under the decree to make certain that the Regional Holding Companies do not impede competition in the non-telecommunications markets they seek to enter. Here again, wide diversification presents a serious threat in terms of cross subsidization and other anticompetitive practices.

The decree assumes, as does the Court, that the Regional Holding Companies may diversify on a significant scale only as they demonstrate the centrality to their corporate life of the responsibilities imposed upon them by the decree, their firm commitment to low-cost, high-quality telephone service, and the improbability of their involvement in anticompetitive conduct based upon their monopoly status. The rules established herein are designed to achieve these objectives while also permitting the Regional Holding Companies to enter into new business ventures to the extent that this will not be a threat to the fundamental purposes of the decree.

---

**122.** If a Regional Holding Company invested or engaged on a substantial scale in speculative ventures only to become insolvent, it might turn to the telephone users for the necessary infusions of capital. Moreover, as the experience of the railroads indicates, it is not inconceivable that, should the competitive enterprises of the Regional Holding Companies become profitable while local telephone service becomes a relative liability, they might seek to sell off or otherwise discard their local telephone service affiliates. See Interstate Commerce Commission, Railroad Conglomerates and Other Corporate Structures, 69–70 (1977), cited in Department of Justice Brief of February 21, 1984 at 11 n. *.

**123.** As the Court has noted before, telephone service is no longer a luxury, but is an essential service not only for conducting business but also as a link to the world for the elderly, the poor, the ill, those living in sparsely settled areas—in brief, everyone.

**124.** Since there is no competition in local service, and for technological reasons cannot be for some time, the quality of the performance of the Operating Companies cannot even be measured against the benchmark of the performance of others.